[Civ. No. 14890.   Second Dist., Div. One.   Nov. 29, 1945.]

BOAT AND BARGE CORPORATION (a Corporation), Respondent, v. BEVERLY FINANCE CO. (a Corporation) et al., Appellants; LAWRENCE B. GIBBS, Cross-defendant and Respondent.

Overton, Lyman & Plumb, Irving H. Prince and B. R. Ware for Appellants.

Horace S. Wilson and Paul Overton for Respondents.

WHITE, J.—This is an appeal from a judgment in favor of Boat and Barge Corporation, a corporation, plaintiff and cross-defendant, and Lawrence B. Gibbs, cross-defendant, and against the defendants and cross-complainants Beverly Finance Company, a corporation, and Stanley W. Smith.

By its complaint plaintiff alleged that on or about June 26, 1943, defendants entered into a written agreement with one Lawrence B. Gibbs; that on the same day Gibbs by an instrument in writing assigned said agreement to plaintiff, Boat and Barge Corporation; that said plaintiff and Gibbs fully performed all of the covenants and obligations under such agreement; that between the first day of June and the first day of December, 1943, plaintiff at the special instance and request of defendants paid and expended moneys aggregating the sum of $19,533.77 for the use and benefit of defendants pursuant to the provisions of the aforesaid agreement and particularly paragraph 3 thereof. It was then alleged that defendants orally promised to repay said moneys to plaintiff on demand, but notwithstanding repeated requests so to do have failed and refused to pay to plaintiff any part of the aforesaid sum.

All of the foregoing allegations contained in plaintiff's complaint, save and except the execution and assignment of the agreement, were denied and placed in issue by defendants' answer.

Defendants filed a cross-complaint against plaintiff and with leave of court joined Lawrence W. Gibbs therein as a cross-defendant. This pleading contained two causes of action, the first of which referred to the agreement mentioned in plaintiff's complaint as being assigned to it and then alleged that as a part of such assignment plaintiff Boat and Barge Corporation agreed to abide by and perform each and all of the terms, provisions and conditions thereof; that said agreement, among other things, contained the following terms and provisions: "It is understood that there is in the yard of North American certain unused stock of parts, materials and supplies which may be used to complete said contract No. NX ss 18759. It is agreed by and between the parties hereto that during the month of June, 1943, a full and complete inventory shall be taken covering all such stock of parts, materials and supplies, and that its value shall be determined upon the basis of its cost F. O. B. the yard of said North American and that any portion of said stock of

parts, materials and supplies not used by North American as at the close of July 15, 1943, in the construction of the boats covered by said contract No. NX ss 18759 shall be paid for by Gibbs to Beverly at said inventory cost on or before the 25th day of July, 1943.''

It is then alleged that at the time said agreement was executed and at all other pertinent times there was located in the yard of North American, referred to in the foregoing portion of the agreement, an unused stock of parts, materials and supplies; that a portion of such unused stock has not been and will not be used to complete contract No. NX ss 18759 referred to in said portion of the above-mentioned agreement; that in accordance with the terms and provisions of said portion of said agreement, a full and complete inventory of such unused stock was taken and that its value, based upon its cost F. O. B. the yard of North American, is and was at all times herein mentioned the sum of $21,671.82. It is then alleged that notwithstanding demand upon the named cross-defendants for payment of said sum of $21,671.82, the latter have refused payment and that the whole of said sum is due, owing and unpaid. Full, faithful and prompt observance and performance of each and all of the terms and provisions of said agreement enjoined upon them is then alleged by cross-complainants.

The second cause of action set forth in the cross-complaint alleges that between the first day of June and the 31st day of December, 1943, cross-complainants, at the special instance and request of cross-defendants, paid and expended varying sums of money aggregating $10,183.75 for the use and benefit of said cross-defendants in payment and discharge of the obligations assumed and agreed to be paid by them under and pursuant to the terms and provisions of the aforesaid agreement and the agreements referred to therein; that cross-defendants promised and agreed to repay said moneys on demand, but notwithstanding such demand have refused to pay said sum or any part thereof, and that the whole is now due, owing and unpaid.

The cross-defendants, in answer to the above-mentioned first cause of action, denied that a full and complete inventory of unused or any stock of parts was taken or that its value is or was the sum of $21,671.82, and in this connection alleged that under the terms and provisions of said agreement only such portion of the unused stock of parts that were

usable in the completion of certain 45-foot picket boats would be paid for by cross-defendants and that the inventory value of such stock of parts is and was only the sum of $14,835.93, which said sum has been paid.

As to the second cause of action, the cross-defendants denied and placed in issue all the allegations thereof.

The cause proceeded to trial before the court sitting without a jury, and upon the completion thereof the court filed its findings of fact wherein it found that the heretofore mentioned allegations of plaintiff's complaint were true and found further that "between the first day of June and the first day of December, 1943, plaintiff, at the special instance and request of defendants, paid and expended for the use and benefit of defendants, for and in the completion of certain 45-foot picket boats for the United States Navy, under contract No. NX ss 18759, moneys in the amounts and for the purposes as follows, to wit:

"Materials .............................. $12,774.74
Direct Labor ........................... 16,979.21
Social Security Taxes ................... 617.15
Overhead (Indirect Expense) ............ 12,162.67

Aggregating the Total of ................ $42,533.77

"And during said period said defendants are entitled to credits against said expenditures as follows, to wit:

"Inventory Credit ........................ $14,589.36
Cash paid by defendant, Beverly Finance
    Co. to plaintiff ...................... 5,000.00
Payments by defendant, Beverly Finance Co.
    for use and benefit of Plaintiff .......... 3,410.64

Aggregating the total of ................. $23,000.00

"The net balance of moneys so expended by plaintiff for the use and benefit of defendants over and above said credits is the sum of $19,533.77."

The court further found that "plaintiff agreed to pay for all parts, materials and supplies at the yard of North American Shipbuilding Corporation that were usable in the completion of six 45-foot picket boats under contract No. NX ss 18759 and which were not used therefor at the inventory cost thereof f.o.b. the yard of North American Ship-

building Corporation. The inventory cost of all said parts, materials and supplies so usable and not so used together with the freight or transportation charges thereon f.o.b. said yard is $14,589.36. Said sum was paid by plaintiff to defendants by giving defendants credit for said sum against moneys expended by plaintiff for the use and benefit of defendants.''

The court also found that ''each and every allegation contained in the cross-complaint on file herein is untrue, except as herein expressly found to be true.''

Judgment accordingly was rendered in favor of plaintiff and against defendants for the sum of $19,533.77. Upon the cross-complaint judgment was entered for the cross-defendants. From such judgment defendants and cross-complainants prosecute this appeal.

At the trial no issue was made, nor is any raised here, with reference to that portion of the aforesaid findings wherein the court found that plaintiff had expended for the use and benefit of the defendants the sum of $12,774.74 for materials and the further sum of $16,979.21 for direct labor.

The question presented for determination on this appeal is the correctness of those findings and the judgment predicated thereon whereby the trial court awarded to plaintiff in accordance with its complaint the sums of $617.15 for social security and $12,162.67 for overhead (indirect expense), and denied to cross-complainants under their second cause of action the aggregate sum of $4,885.42 for interest, supervision fees, legal fees, state unemployment and old age benefits; and further denied any relief to cross-complainants under their first cause of action whereby they sought to recover an additional aggregate sum of $4,886.79, representing the alleged inventory value of a portion of the unused stock of parts located in the yard of North American Shipbuilding Corporation.

An epitome of the factual background which gave rise to this litigation will aid in a determination of the legal questions with which we are confronted. At the time of the Pearl Harbor attack upon our armed forces in December, 1941, A. M. Rambo was operating a boat-building business at Newport Beach in Orange County, California, under the noncorporate name of ''A. M. Rambo Co.'' On February 17, 1942, he entered into a contract with the United States for the construction of certain boats and spare parts for the sum

of $113,313.78, said contract being designated as "U. S. Government Contract No. 99017." On September 15, 1942, an additional contract was entered into, designated as extension "A" of the above-mentioned contract, and under the terms of which A. M. Rambo Co. agreed to construct for the United States Navy Department eleven additional aircraft rescue boats for the total sum of $118,307. North American Shipbuilding Corporation was organized as a California corporation for the purpose of acquiring all of the assets and assuming all of the obligations of the above-mentioned A. M. Rambo Co.

On November 21, 1942, an agreement was entered into between North American Shipbuilding Corporation (hereinafter referred to as North American), Beverly Finance Company (hereinafter called Beverly, and of which corporation defendant Stanley W. Smith was president), and A. M. Rambo (hereinafter designated as Rambo), under the terms of which Rambo agreed to transfer to North American all of the assets of A. M. Rambo Co. and North American agreed to assume all of the obligations of A. M. Rambo Co. During the term of the agreement Beverly was to exercise complete supervision and management of the business of North American in carrying out the aforesaid Navy contract No. 99017 and extension "A" thereof, as well as any additional contracts entered into by North American "during the duration of the present war," with the further proviso that no additional contracts would be entered into by North American unless first approved by Beverly.

In consideration of the agreement on its part to arrange for and secure the necessary financing of North American, not exceeding the sum of $20,000, to be utilized for the liquidation of all unpaid necessary labor and materials furnished in connection with said contract No. 99017, "for the amount in the opinion of Beverly required for the payment of all necessary labor performed and material furnished in connection with said Extension 'A' to said contract No. 99017 and in connection with any additional contracts entered into by North American," and "for the money necessary to pay the cost of such of the overhead expense of North American as shall first be approved by Beverly," Beverly was to receive six per cent interest on all moneys so advanced; a management fee of $500 per month during the term of the agreement; thirty per cent (but not less than $2,500) of

the net profits earned by North American under extension "A" of said contract No. 99017; and thirty per cent of the net profits under any other contract.

Nine days later, under date of November 30, 1942, Rambo entered into another contract with the United States Government, designated as contract No. NX ss 18759, for the construction of six 45-foot aircraft rescue boats (later changed to picket boats, and which will be hereinafter referred to as the Beverly boats), for a total consideration of $150,000.

By a contract dated June 9, 1943, executed between the parties to the aforesaid agreement of November 21, 1942, the percentage of the net profits payable to Beverly and the manner of payment thereof were modified and changed. In the last-named contract of June 9 we find the following: "It is contemplated that this agreement shall be assigned by Beverly to Lawrence B. Gibbs (one of the cross-defendants herein), and thereafter may be assigned to a California corporation organized by him. Upon the execution of such assignment to Gibbs, Beverly shall *ipso facto* be released from any obligations to North American and Rambo under said agreement, excepting as to contracts designated as United States Government Contract No. 99017 and Extension 'A' thereof and contract No. NX ss 18759."

By an agreement dated June 26, 1943, the foregoing agreement dated November 21, 1942, as modified by the agreement of June 9, 1943, was assigned to Lawrence B. Gibbs. By consent of the parties this agreement became effective as of June 1, and the account books of North American were so set up. It is this agreement of June 26 which forms the basis of this litigation. It might here be noted that plaintiff Boat and Barge Corporation, of which the aforesaid assignee and cross-defendant Lawrence B. Gibbs was vice-president, assumed the obligations of Gibbs under the June 26 agreement.

By the terms of said agreement of June 26, 1943, it was provided that Gibbs or his successor would cause North American to complete the six 45-foot aircraft rescue boats (subsequently changed to picket boats) under contract No. NX ss 18759 dated November 30, 1942. This Navy contract for the just-mentioned six boats was the last and final contract supervised in part and financed by Beverly. Plaintiff Boat and Barge Corporation arranged for the financing of

North American under the Navy contract of June 10, 1943, for ten boats, in a manner similar to that theretofore utilized by Beverly.

Manifestly, under the circumstances hereinbefore narrated, it became necessary for the parties to define, divide and allocate the overhead of North American between the six Beverly boats and the ten Boat and Barge Corporation boats then under construction. To effectuate this there was included in paragraph 4 of the agreement of June 26, 1943, the following provision:

"Beverly hereby agrees to loan, or cause to be loaned, to North American, in accordance with the provisions of said agreement of November 21, 1942, as subsequently modified by said agreement of June 9, 1943, the monies necessary to pay for all labor and·materials required for the completion of said Contract Extension 'A' and said above mentioned contract No. NX ss 18759, and to pay to Gibbs the sum of $4,000.00, to be applied by him against the overhead of said North American incurred during the time required to complete the said two contracts hereinabove mentioned in this paragraph. Said sum of $4,000.00 shall be payable, $2,000.00 on or before July 5, 1943, and the balance on or before August 5, 1943. In computing profits in connection with contracts entered into by said North American, said $4,000.00 shall be chargeable as the entire additional overhead expense after June 1, 1943, charged against said contract No. NX ss 18759. All additional overhead after June 1, 1943, shall be charged to contracts entered into by North American after May 1, 1943. Said overhead shall consist of items which it has been the custom to charge to overhead expense since January 1, 1943, as shown by the books of North American."

From a consideration of the foregoing provisions of the agreement, it is at once apparent that the construction of the six Beverly boats theretofore financed by Beverly and the Union Bank through loans to North American had not been completed, and it was necessary that they be completed by North American under the supervision of Boat and Barge Corporation. Therefore the natural and obvious intention of the parties was to provide for an allocation of overhead expense during the period when the six unfinished boats were being completed and the construction of the ten Boat and Barge Corporation boats was commenced and progressed.

To complete the six Beverly boats money was necessary, not only for labor and material (direct costs), but also for overhead, or indirect costs. The first-mentioned problem was easy of solution, requiring only an accounting record of the materials going into and the man-hours of labor employed upon the respective boats. However, the question of indirect costs, consisting as they did of general office expense, superintendence, taxes, etc., was not so simple.

It is the contention of appellants that under the terms of the foregoing paragraph 4 of the agreement the amount allocated as overhead was limited to $4,000. The trial court, however, awarded plaintiff Boat and Barge Corporation the sum of $12,162.67, which amount represents a percentage of the total overhead of North American for the months of June, July, August and September, basing the percentage for a particular month upon the proportionate amount of man-hours of direct labor expended on the Beverly boats. We deem it a fair statement, based on the record herein, to say that at the time the foregoing agreement was entered into the parties were of the opinion that the six boats would be completed by July 15, but in fact they were not finished for some sixty days or more thereafter, and it was evident that the delay in completion of the Beverly boats was not occasioned through any fault of Boat and Barge Corporation or cross-defendant Gibbs, nor through any fault of North American or its factory operations, but was attributable to the inability to get parts through the Navy Department.

In their claim that $4,000 was the limit of overhead expense for which Beverly would be liable to complete its six unfinished boats, appellants place great reliance upon that portion of the foregoing paragraph 4 of the agreement reading as follows: "Said $4,000.00 shall be chargeable as the entire additional overhead expense after June 1, 1943, charged against said contract No. NX ss 18759." But there is also contained in the same paragraph the following: ". . . and to pay to Gibbs the sum of $4,000.00 *to be applied by him* against the overhead of said North American incurred during the time required to complete the said two contracts hereinabove mentioned in this paragraph." (Emphasis added.)

Furthermore, when neither of the $2,000 payments provided for in paragraph 4 were made, cross-defendant Gibbs communicated with defendant Smith, informing the latter

that ". . . the contract was dragging out; that the overhead was increasing, and that we had to have some money to pay for this money which we were advancing, and on two occasions Mr. Smith said all we had to do was to look up his credit status and go ahead and get the boats finished, and he would pay the bills. . . ." Thereupon Smith sent a check for $5,000. Such conduct does not justify the inference that Smith regarded $4,000 as the limit of Beverly's obligations on account of overhead, but rather supports the inference arrived at by the trial court that he recognized that the $4,000 "to be applied on overhead" was an estimate, and that any other or all overhead costs would be paid upon completion of the six Beverly boats.

Over the objections of defendants the trial court permitted the cross-defendant Gibbs to testify as to the circumstances under which the agreement was made. We perceive no error in the court's ruling in this regard. Explanation of a contract by reference to the circumstances under which it was made and the matter to which it relates is authorized by section 1647 of the Civil Code. Evidence of "surrounding circumstances" is not admissible in connection with a written contract to add or take away anything from the agreement, but this rule of evidence is invoked in cases where upon the face of the contract itself there is doubt, "to dispel that doubt, not by showing that the parties meant something other than what they said, but by showing what they meant by what they said." (*United Iron Works* v. *Outer Harbor etc. Co.,* 168 Cal. 81, 84, 85 [141 P. 917].) The evidence was not admitted for the purpose, nor would it have the effect, of varying the terms of the contract. It was admitted for the purpose of interpretation. Neither was the challenged evidence received for the purpose of putting a different sense and construction upon the language of the contract from that which it would naturally bear, but for the purpose of showing the circumstances under which the language was used and applying such language according to the intention of the parties. From the facts and circumstances shown by the record herein it would appear that the court was justified in concluding that the most reasonable interpretation of that paragraph in question was that by its terms Beverly agreed to pay Boat and Barge Corporation such overhead expense as was incurred in completing the former's six unfinished boats, and that the $4,000 mentioned in the agree-

ment was not in full and final payment of such overhead expense, but was, as stated in the contract, "to be applied by him against the overhead of said North American incurred during the time required to complete the said two contracts . . ." involving the six Beverly boats.

Appellants next contend that the trial court committed error in giving judgment to plaintiff on its complaint for $617.15 for social security taxes, and also erred in refusing to give judgment in favor of cross-complainants under their cross-complaint for $1,593.10 interest, $2,500 supervision fees, $250 attorney's fees, and $542.32 state unemployment and old age benefits. The first item represents the money paid by Gibbs as social security taxes upon the direct labor employed in finishing the Beverly boats. The trial court did not regard this item as an overhead charge, but as a direct charge against the Beverly boats; hence disallowed it. This was not error. Under the agreement of June 26, 1943, Beverly agreed to loan to North American "the monies necessary to pay for all labor and materials required for the completion" of the Beverly boats. The social security tax item was a direct charge, just as were labor and materials, against the Beverly boats. Such taxes are computed on a basis of a percentage of the direct labor payroll, and the social security taxes resulting from the labor performed on the Beverly boats could be definitely determined from time to time from the payroll covering labor expended in the construction of the Beverly boats. It was a simple matter of arithmetic. There was nothing indirect about it which would bring it into the category of overhead expense. In an effort to avoid such an interpretation appellants assert that under the terms of paragraph 4 of the above-mentioned contract of June 26, 1943, the parties thereto defined the meaning of overhead expense when they provided "said overhead shall consist of items which it has been the custom to charge to overhead expense since January 1, 1943, as shown by the books of North American," and that the foregoing tax item was included as overhead on the books of North American during the months of January to May, inclusive, of 1943. From a careful reading of paragraph 4 of the June 26 agreement we are convinced that the above-quoted language upon which appellants rely has reference to the computation of profits, as stated in the contract, "entered into by North American." In other words, the

language has to do with the relationship between plaintiffs Smith and Beverly with North American in connection with the division of profits between them. Furthermore, as we have heretofore pointed out, the trial court correctly determined that under the contract cross-defendants Gibbs and Boat and Barge Corporation were entitled to credit for all monies advanced to complete the Beverly boats, whether for direct or indirect costs, and the same was not limited to $4,000. The limitation of $4,000, we are convinced, referred only to the accounting arrangements in connection with the division of profits, and was intended to serve, as it would, to reduce Gibbs' profits, if any, under the contract which he had assumed the obligation of financing.

What we have just said concerning the social security tax is equally applicable to the item of $542.32 representing state employment and old age benefits. It also was a direct and not an indirect expense incurred in the completion of the Beverly boats. For the reasons hereinbefore advanced, it was not recoverable by Beverly under the theory that $4,000 was the agreed maximum overhead expense.

The item of $1,593.10 represents interest on money supplied by Beverly to Rambo or the shipbuilding corporation to complete the Beverly boats pursuant to the agreement of November 21, 1942. Evidence was presented from which the court was warranted in concluding that interest on borrowed money is not a cost of a product—in this instance, the boats; that while it may affect the profit of the operations, it does not enter into the costs, and was not, therefore, a charge against the boats. Furthermore, the interest concerned only the relationship between defendants and the shipbuilding corporation in connection with their respective profits.

With reference to the item of $250, representing attorney's fees, respondents contend in their brief that as to this item no proof was offered in support of it as a charge "against anyone." In their reply brief appellants make no answer to this contention, and an examination of the record reveals no evidence in support of appellants' claim.

The remaining item of $2,500 claimed as "supervision fees" must be regarded as a direct rather than an indirect cost, relating as it does solely to the Beverly boats. When the agreements between the respective parties are read in their entirety it appears to us that this is another item which

concerned only defendant Smith and the shipbuilding corporation when the occasion arrived for a division of profits earned under the so-called Smith or Beverly boat contract.

Finally, appellants assert that the trial court fell into error in refusing to award and credit to cross-complainants under the first cause of action of their cross-complaint the inventory value of two portions of the stock of parts not used as of the close of business July 15, 1943, the same being of the respective inventory values of $2,553.06 and $2,333.41. Appellants' claim is based upon the provision of paragraph 5 of the agreement of June 26, hereinbefore set forth.

In its findings the trial court construed the foregoing provisions as requiring that Boat and Barge Corporation pay for any portions of the unused stock of parts which were similar to those parts used in the completion of the six Beverly boats or which might have been so usable. It is the contention of appellants that the phrase "which may be used to complete said contract," appearing in the foregoing provisions of the agreement, when read with the balance of the paragraph, must be held to mean that Boat and Barge Corporation was authorized and permitted to use, in the completion of the six Beverly boats, such stock of unused parts existing at the date of the execution of the agreement, and that thereafter, on July 15, 1943, when Boat and Barge would know what portion would be required in the completion of the six Beverly boats, to take an inventory of the stock and parts not used and pay for them. Respondents, on the contrary, contend that the intent and meaning of the above-mentioned phrase was that Boat and Barge Corporation was obligated to pay for only such of the materials and supplies in the yard as were usable either in the completion of the six Beverly boats or in the construction of the Boat and Barge Corporation ten boats, and the trial court so concluded. The materials and supplies on hand in the yard for which credit to cross-complainants was refused consisted of materials purchased for the aircraft rescue boats, and which materials were not usable after the Navy had changed the specifications on the six Beverly boats. It is noteworthy that because of the change in specifications a claim had been made against the Navy Department for the materials which were rendered unusable by reason of the change. Reading the foregoing provisions of paragraph 5

in the light of testimony received to show what the parties meant by what they said in the questioned paragraph, we are persuaded that the trial court was justified in holding that the phrase ''any portion of said stock of parts, materials and supplies not used by North American as at the close of July 15, 1943, in the construction of said contract No. NX ss 18759'' referred only to such materials as were usable in the completion of the Beverly boats and did not require that Boat and Barge Corporation pay for all materials at the yard regardless of their usability in the construction of the picket boats after the action of the Navy Department in changing the original specifications. It also appears that the Navy Department paid the sum of $1,700 for the unusable materials to defendant Smith or the Union Bank. In any event, the claim was recognized and approved by the Navy Department and payment thereunder was not made to Boat and Barge Corporation. Had it been the intention of the parties that the obligation of Boat and Barge Corporation was to pay Beverly for all materials in the yard, whether usable or unusable in the construction of the picket boats, obviously the phrase ''which may be used to complete said contract No. NX ss 18759'' would not have been employed.

For the foregoing reasons the judgment is affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied December 20, 1945, and appellants' petition for a hearing by the Supreme Court was denied January 24, 1946.